IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION
*

EQUAL EMPLOYMENT OPPORTUNITY    *
COMMISSION,
                                *
     Plaintiff,
                                *
     v.                              CIVIL NO.:  WDQ-06-2527
                                *
DENNY'S, INC.,
                                *
     Defendant.
                                *

*     *     *     *     *     *     *     *     *     *     *     *     *

MEMORANDUM OPINION

The Equal Employment Opportunity Commission ("EEOC") sued

Denny's for wrongful termination of disabled employees in

violation of the Americans with Disabilities Act of 1991

("ADA").  Paula Hart, an above-the-knee leg amputee, is one of

the claimants.  Pending is Denny's motion for summary judgment

on the claims with respect to Hart and its motion to seal that

document.  For the following reasons, the motion for summary

judgment will be denied, and the motion to seal will be granted.

I.   Background[1]

In May 1999, Hart began working as a Restaurant Manager at

Denny's on Belair Road in Baltimore, Maryland (the "Belair

---

[1]  For Denny's motion for summary judgment, the EEOC's "evidence
is to be believed, and all justifiable inferences are . . .
drawn in [its] favor."  *Anderson v. Liberty Lobby*, 477 U.S. 242,
255 (1986).

Restaurant"). Paula Hart Dep. Ex. 20, Aug. 23, 2007 [hereinafter *Hart Dep. I*]. She typically worked from 7:00 a.m. to 5:00 p.m. five days a week. *Id*. 64:9-22. On three days, her shift overlapped with General Manager Julia Bullock; on two days, Hart was the only manager on duty. *Id*.

Denny's job description states that a restaurant manager: (1) ensures that menu items are prepared and served in accordance with Denny's standards; (2) maintains proper inventory levels for food and nonfood items; (3) directs employees to ensure proper service; (4) investigates and coordinates response to customer feedback; (5) manages labor, cash, food costs, and operating expenses; (6) stays aware of local market trends; and (7) recruits, interviews, hires, and trains hourly employees. Hart Dep. I, Ex. 3 at 1-2 (Denny's Restaurant Manager Job Description, July 2002). A restaurant manager is expected to be capable of "extensive standing and walking without breaks" and "work[ing] irregular hours." *Id*. at 3 (listing the "Physical Requirements" of the job).

As a "front of the house" manager,[2] Hart focused on the dining room, customer service, and administrative tasks.[3] Hart

---

[2] The parties dispute Hart's characterization of her role as a primarily "front of the house" manager. *See* Def.'s Reply 10; Def.'s Mot. 6. Because Hart admits that she was frequently the only manager on duty, Denny's argues that her responsibilities included management of the entire Belair Restaurant and not merely the "front of the house." Def.'s Reply 10 n.10.

Dep. I 44:19-46:9, 58:1-9. She would visit tables to ask about customers' experience, expedite orders, refill beverages, and invite them back again. *Id.* 58:1-6, 60:10-15, 69:11-15, 71:12-16. Hart also regularly walked "figure-eights" around the restaurant to inspect, direct employees, and help out when needed. *Id.* 66:6-21, 72:5-10.[4]

In November 2002, Hart took medical leave after debilitating numbness in her right leg. *Id.* 113:18-114:16. Her December 2002 and January 2003 surgeries resulted in an above-the-knee amputation of her right leg. *Id.* at 124:16-125:6; Paula Hart Decl. ¶ 2, March 12, 2010.[5]

On March 6, 2003, Denny's informed Hart that, if she was unable to return to work by April 27, 2003, she would be terminated for exceeding the 26-week maximum, short-term disability leave. Pl.'s Opp., Ex. 7.[6] On April 3, 2003, Hart's

---

[3] These administrative duties included creating the employee schedule, calling in employees to cover absences, counting cash, and making bank deposits. Hart Dep. I 56:5-7, 65:21-66:1, 68:3-6, 72:11-19.

[4] The EEOC characterized Hart's position as "wholly managerial" and "primarily responsible for supervision, staff development, and training." Pl.'s Opp. 2.

[5] Hart was diagnosed with peripheral arterial or coronary artery disease and was also borderline diabetic. Hart Dep. I 107:14-18, 110:6-21.

[6] Hart had taken medical leave from September 17, 2002 to October 20, 2002 and then again starting December 1, 2002. Pl.'s Opp., Ex. 7.

surgeon, Dr. Rajesh Raikar, released her to return to work but restricted her activity to "limited light duty until further notice." Pl.'s Opp. Ex. 8. With the approval of Area Manager Marcy Matyas, Bullock agreed to let Hart return on a modified, part-time schedule and then change to full-time work. Hart Dep. I 121:4-15; Paula Hart Dep. 42:5-16, Aug. 24, 2007 [hereinafter *Hart Dep. II*].[7]

On April 7, 2003, Hart returned to work. Hart Dep. I, Ex. 17 at 1. On April 15, 2003, after five days under the modified schedule, Bullock informed Hart that Denny's area management would no longer allow her to work at the restaurant. Hart Dep. II 52:4-14. Hart contacted Human Resources Manager Bruce Webber for an explanation of this decision, but her two messages were never returned. *Id.* at 53:22-55:1.

On April 16, 2003, Louise Lock, Esquire,[8] contacted Webber to discuss Denny's view that Hart was a "safety hazard" and Bullock's opinion that Hart could still work "with some minor accommodations." Pl.'s Opp., Ex. 9. On May 1, 2003, Lock spoke

---

[7] Hart planned to "work three or four short days and [then] take two vacation days" each week until she exhausted her 80 hours of accumulated vacation time. Hart Dep. I 121:4-12, 164:2-6. Then, Hart planned to resume a full-time schedule. Hart Dep. II 37:2-11.

[8] Lock was Hart's attorney in an unrelated medical malpractice action (*Hart v. Raikar*, No. 03-C-05-003391 (Baltimore County Cir. Ct.). Hart Dep. II 55:2-11.

with Assistant General Counsel Robert Barrett to restate her

concerns and request that Denny's reconsider its decision to

terminate Hart. *Id*.[9]  On May 16, 2003, Barrett sent a letter

confirming Hart's termination.  Pl.'s Opp., Ex. 10.  He

explained that because Hart's "condition presently requires her

to utilize either a walker or wheelchair to ambulate, she is not

in a position to perform the essential functions of the job of a

restaurant manager." *Id*.  The letter further stated that

Denny's had "no other available positions which [Hart] could

perform in light of her limitations" but would "monitor [her]

rehabilitation with the hope and expectation that she [would]

soon be released and able to safely perform the essential

functions of" her old job. *Id*.

In June 2003, Hart was fitted with a prosthetic leg. Hart

Dep. I 126:19-21.[10]  On September 30, 2003, Dr. Raiker determined

that Hart was "capable of performing full time work, which [was]

primarily seated in nature, allow[ed] the flexibility to sit

[or] stand when needed, and required minimal lifting."  Pl.'s

Opp., Ex. 12.  But, in April 2004, Dr. John Loh found that Hart

---

[9]  The parties agree that Hart's termination took effect on May
8, 2003. *See* Def.'s Mot. 25; Pl.'s Opp. 15.

[10]  Initially, Hart was only able to use her prosthetic leg
"about an hour a day," *id*. at 128:1-3, but she eventually could
use it up to five hours a day, *id*. at 136:11-13.  By October
2003, Hart could walk with her prosthetic leg and a four-pronged
cane.  Hart Dep. I 128:13-22.

was unable to work because she could not stand, walk, carry, or perform other physical activities during an eight-hour workday. Pl.'s Opp., Ex. 13 at 3.

On September 26, 2006, the EEOC, on behalf of Hart and a class of unidentified Denny's employees with disabilities, sued Denny's for unlawful employment practices in violation of Title I of the ADA. Paper No. 1. On December 4, 2006, Denny's answered the complaint. Paper No. 7. On November 5, 2007, Judge Andre Davis entered an Amended Protective Order, which required, *inter alia*, that documents disclosing or attaching confidential discovery materials be filed under seal. Paper No. 28 at 6.[11] On January 15, 2010, Denny's moved for summary judgment on the claims with respect to Hart and to seal that motion. Paper Nos. 54 & 55.

## II. Analysis

### A. Standard of Review

Under Rule 56(c), summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In considering a

---

[11] Because there has been no opposition to Denny's motion to seal its memorandum in support of summary judgment and the attached exhibits, that motion will be granted pursuant to the Amended Protective Order.

motion for summary judgment, "the judge's function is not . . .
to weigh the evidence and determine the truth of the matter but
to determine whether there is a genuine issue for trial."
*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  A
dispute about a material fact is genuine "if the evidence is
such that a reasonable jury could return a verdict for the
nonmoving party."  *Id*. at 248.  The Court must "view the
evidence in the light most favorable to . . . the nonmovant, and
draw all reasonable inferences in h[is] favor," *Dennis v.*
*Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir.
2002), but the Court also "must abide by the affirmative
obligation of the trial judge to prevent factually unsupported
claims and defenses from proceeding to trial," *Bouchat v.*
*Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th
Cir. 2003).

B.    Evidentiary Objections

The EEOC has challenged several of Denny's exhibits.  Under
Fed. R. Civ. P. 56, the Court may consider evidence on summary
judgment that would be admissible at trial.[12]  Depositions and
affidavits must be based on personal knowledge, and all
documents and other physical evidence must be properly

---

[12]  *See Conkwright v. Westinghouse Elec. Corp.*, 739 F. Supp.
1006, 1014 n.7 (D. Md. 1990)(*citing* 10A Charles Alan Wright,
Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure*
§ 2721 (3d 1998)).

authenticated and either non-hearsay or within a recognized exception.[13]  But "uncertified or otherwise inadmissible documents may be considered by the court if not challenged." Wright, Miller, & Kane, *supra*, § 2722.  An objecting party must "spell out the nature of the defects clearly and distinctly." 11 James W. Moore, *et al.*, *Moore's Federal Practice*, § 56.14(4)(b).

"[T]he papers of a party opposing summary judgment are usually held to a less exacting standard than those of the moving party." *Salami v. North Carolina Agric. & Tech. State Univ.*, 394 F. Supp. 2d 696, 706 (M.D.N.C. 2005) (*quoting Grey v. Potter*, No. 1:00CV00964, 2003 WL 1923733, at *4 (M.D.N.C. Apr. 21, 2003)).  "[T]he nonmoving party need not produce evidence in a form that would be admissible at trial, but the content or substance of the evidence must be admissible." *Thomas v. IBM*, 48 F.3d 478, 485 (10th Cir. 1995)(internal citations omitted). "[D]oubts regarding admissibility are resolved in favor of the party opposing summary judgment." *U.S. v. Bell*, 27 F. Supp. 2d 1191, 1194 (E.D. Cal. 1998).

---

[13]  *See* Fed. R. Civ. P. 56(e); *Cottom v. Town of Seven Devils*, 30 Fed. Appx. 230, 234 (4th Cir. 2002); *Orsi v. Kirwood*, 999 F.2d 86, 92 (4th Cir. 1993)("It is well established that unsworn, unauthenticated documents cannot be considered on a motion for summary judgment.").

Here, the EEOC has made blanket objections to the "inadmissible hearsay and opinion evidence that is lacking proper foundation" in "various documents generated by third-parties that are associated with Hart's disability applications." Pl.'s Opp. 41. It has also objected to the use of expert reports from Hart's medical malpractice case on the basis that they "are inadmissible hearsay from third-party witnesses." Pl.'s Opp. 36. The EEOC has failed to identify the portions of those documents containing hearsay or the foundational evidence omitted. As the nature of the defects has not been clearly and distinctly stated, the documents have not been properly objected to, and the Court will consider them.

C. ADA Violation

The EEOC contends that Denny's violated the ADA by terminating Hart because of her disability when she was capable, with reasonable accommodation, of performing the essential functions of her restaurant manager position. Pl.'s Opp. 30-35. Denny's argues that, at the time of her termination, Hart was not qualified for the restaurant manager position because she had been restricted to "limited light duty until further notice," and no reasonable accommodation was suggested that would have allowed her to perform the physical duties of the position. Def.'s Mot. 27-40, 47-49. Denny's further argues that it was not required to accommodate Hart's disability by

creating a new position for her, exempting her from the physical
duties of a restaurant managers, or providing her with unlimited
or indefinite leave. *Id*. at 41-47.

Title I of the ADA prohibits covered entities[14] from
"discriminat[ing] against a qualified individual on the basis of
disability in regard to job application procedures, the hiring,
advancement, or discharge of employees, employees compensation,
job training, or other terms, conditions, and privileges of
employment." 42 U.S.C.A. § 12112(a). To make a *prima facie*
case of discriminatory discharge, a plaintiff must show that (1)
she was a qualified individual with a disability,[15] (2) she was
discharged, (3) she was fulfilling her employer's legitimate
expectations at the time of discharge, and (4) the circumstances
of her discharge raise a reasonable inference of unlawful
discrimination. *Rohan v. Networks Presentations LLC*, 375 F.3d
266, 273 n.9 (4th Cir. 2004); *Ennis v. Nat'l Ass'n of Bus. and
Educ. Radio, Inc.*, 53 F.3d 55, 58 (4th Cir. 1995) (*quoting
Burdine*, 450 U.S. at 253). Denny's does not dispute Hart's

---

[14] "Covered entity" includes an employer. 42 U.S.C.A. §
12111(2).

[15] An individual with a disability has (1) a physical or mental
impairment that substantially limits one or more of his "major
life activities"; (2) a record of such impairment; or (3) been
perceived to have a physical or mental impairment. *Id*. §§
12102(1) & (3)(A).

disability but argues that she was not qualified for the restaurant manager position after her surgeries.

A "qualified individual" is one who "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C.A. § 12111(8). "A plaintiff must show that [s]he [could] perform the essential functions of the job at the time of the employment decision or in the immediate future." *Lamb v. Qualex Inc.*, 33 Fed. Appx. 49, 57 (4th Cir. 2002). Thus, Hart must establish that she could have performed the essential functions of a restaurant manager with reasonable accommodation from Denny's when, or soon after, she was terminated.

1.  Essential Functions

An essential function is one that is "fundamental" to a job rather than "marginal." 29 C.F.R. § 1630.2(n)(1). To determine if a particular function is essential, courts may consider, among other things, whether: (1) the position exists to perform that function, (2) a limited number of employees is available to whom that function can be assigned, or (3) the employee was hired for her ability to perform that function because it requires highly specialized knowledge. *Id*. § 1630.2(n)(2).

Courts must give "consideration . . . to the employer's judgment as to what functions of a job are essential," and a written position description prepared by the employer before

advertising or interviewing for that position "shall be considered evidence of the essential functions of the job." 42 U.S.C.A. § 12111(8). Other evidence bearing on whether a particular function is essential includes: (1) the time spent performing that function, (2) the consequences of not requiring the employee to perform that function, (3) a collective bargaining agreement, and (4) the experience of current and past employees in the same position. 29 C.F.R. § 1630.2(n)(3). Generally, "a plaintiff fails to perform the essential function only if her failure detrimentally affects the purpose of the employment." *Rohan,* 375 F.3d at 279.

The parties dispute whether certain physical tasks were essential functions of a restaurant manager. Denny's argues that, in addition to their administrative and oversight duties, restaurant managers must be capable of performing all of the tasks regularly handled by the "code" positions--i.e., the cook, server, dish washer, hostess, and other hourly staff. Def.'s Mot. 3-14. Denny's has provided affidavit and deposition testimony from numerous Denny's employees and an expert report from Dr. Cristina Banks, an organizational psychologist, to show that up to 25% of restaurant managers time is routinely spent on activities such as: (1) carrying trays of food, (2) collecting dishes from tables, (3) dish washing, (4) filling beverages, (5) stocking and monitoring supplies, (6) seating patrons, (7)

preparing and cooking food, (8) cleaning, (9) attending to

patron concerns, (10) unloading and lifting delivery boxes, (11)

"traying up" food for the servers, (12) visiting patrons'

tables, and (13) carrying bus tubs and helping to "pre-bus"

tables. *Id*.

To ensure adequate staff supervision and quality customer

service, Denny's restaurant managers are expected to move

quickly between tasks and circulate through the entire

restaurant. *Id*. at 9, 12-13. Because of the position's

physical demands and Hart's restriction to "limited light duty

until further notice," Denny's argues that Hart could not

perform the essential functions of a restaurant manager in May

2003 or anytime shortly thereafter.

The EEOC disagrees with Denny's assertion that a restaurant

manager needed to be capable of performing all of the code

position tasks. Pl.'s Opp. 18-23. To support its view that

Hart's position was "wholly managerial," the EEOC relies on: (1)

the restaurant manager job description, (2) Hart's experience

before her termination, and (3) an expert analysis of the Belair

Restaurant's operations by Daniel Rappucci, a vocational

rehabilitation counselor.[16]

_____

[16]   The EEOC also criticizes the evidence supporting Dennny's
motion for summary judgment, arguing that (1) the Banks report
"ignore[d] basic principles of ADA methodology," and (2) Debra
Shook's testimony about her experience as a restaurant manager

That duties are not listed in a job description is some
evidence that they may not be essential to a position. *See
Calef v. FedEx Ground Packaging Sys., Inc.*, 343 Fed. Appx. 891,
902 (4th Cir. 2009). Here, the restaurant manager job
description states numerous supervisory and administrative
responsibilities but does not require restaurant managers to be
able to perform the duties of other code positions. Because the
restaurant manager job description did not list that function,
the EEOC argues that this duty was not fundamental to the
position. *Id*. at 1-2, 20.

Hart's description of her experience as a restaurant
manager before her surgeries is also relevant evidence of the
essential functions of her position. *See Skerski v. Time Warner
Cable Co.*, 257 F.3d 273, 281 (3d Cir. 2001). In her declaration
and deposition, Hart described her primary responsibilities as
"dealing with customers," doing "paperwork," and directing other
employees. Hart Dep. I 56:5-10, 58:7-9. *Id*. at 72:20-22. She
did not find the position to be "physically demanding." *Id*. at
97:17. Because the Belair Restaurant had a large number of
staff, Hart never had a problem finding someone to cover another

at the Belair Restaurant is largely irrelevant because, unlike
Hart, she worked the "graveyard shift" and was primarily a "back
of the house" manager. Pl.'s Opp. 23-29. Because the Court
does not weigh the evidence on summary judgment, *see Williams v.
Staples, Inc.,* 372 F.3d 662, 667 (4th Cir. 2004), these
arguments will not be addressed.

employee's absence.  *Id*. 72:20-22.  The Belair Restaurant also
had several Star Coordinators,[17] who were specifically designated
to fill-in as needed for other positions.  Hart explained that
during her shifts she rarely, if ever, (1) cooked,[18] (2)
delivered food for the servers,[19] (3) performed heavy lifting,[20]
(4) unloaded delivery trucks,[21] (5) fixed things that were
broken,[22] (6) cleaned,[23] or (7) moved bus tubs.[24]  Thus, Hart's
testimony about her work is inconsistent with Denny's
characterization of the physical tasks routinely performed by
restaurant managers.

    Rappucci's report and testimony cast further doubt on the
importance of the physical tasks to Hart's position.  During his
two-day observation of the day-shift operations at the Belair
Restaurant, Rappucci never "observe[d] the manager performing a
code task or duty that could not have been performed by another
available employee."  Pl.'s Ex. 17 at 20.  He found that there

---

[17]  Hart Decl. ¶ 12.

[18]  Hart Dep. I 44:21-45:7; 59:3-60:5.

[19]  *Id*. at 58:15-59:2; 62:2-4.

[20]  *Id*. at 100:9-12.

[21]  *Id*. at 74:2-9.

[22]  *Id*. at 66:9-16.

[23]  *Id*. at 67:7-22; Paula Hart Decl. ¶ 6, March 12, 2010.

[24]  *Id*. at 71:7-9.

was "managerial discretion in regard to job task performance," i.e., some managers chose to engage in more physical tasks than others. *Id*. Thus, he concluded that "discretionary performance of code job tasks is a marginal job function." *Id*. at 20-21.[25]

The evidence presented by Denny's and the EEOC creates a question of fact about the physical duties of a restaurant manager. Drawing inferences in favor of the EEOC, a reasonable jury could conclude that an ability to perform all the other code positions was not an essential function of the restaurant manager. Accordingly, summary judgment must be denied.

2.   Reasonable Accommodation

Unless it would "impose an undue hardship on the operations of [its] business," an employer must make "reasonable accommodations" for an otherwise qualified person with a disability.   42 U.S.C.A. § 12112(b)(5)(A).   Reasonable accommodations may include "making existing facilities . . . accessible to and usable by individuals with disabilities" and "job restructuring, part-time or modified work schedule, reassignment to a vacant position, acquisition or modification of equipment or devices . . . and other similar accommodations

---

[25]   Rappucci also determined that "the associated essential function . . . would be 'ensur[ing] guest satisfaction th[r]ough directing operational execution of proper service . . . [making] changes to the operation as necessary to ensure guest satisfaction.'"   Pl.'s Ex. 17 at 21 (quoting the restaurant manager job description).

for individuals with disabilities." *Id*. § 12111(9).  The

plaintiff has the initial burden to identify an accommodation

that would allow her to perform the job, and the ultimate burden

of persuasion as to its reasonableness.  *Lamb*, 33 Fed. Appx. at

59.[26]

The EEOC has argued that Hart's brief return to the Belair

Restaurant in April 2003 demonstrates that she was capable of

working as a restaurant manager with reasonable accommodation.

Pl.'s Opp. 31-35.  Denny's argues that the temporary,

administrative position "created" for Hart during her brief

return did not encompass the essential functions of a restaurant

manager; thus, her ability to perform that work does not show

that she could perform her old job with reasonable accommoda-

tion.  Def.'s Mot. 41-43.

To establish a *prima facie* case of failure to accommodate,

a plaintiff must show that: (1) she is disabled, (2) the

employer had notice of her disability, (3) she could have

performed the essential functions of the position with

reasonable accommodation, and (4) the employer refused to make

such accommodations.  *Rhoads v. FDIC*, 257 F.3d 373, 387 n.11

(4th Cir. 2001) (*quoting Mitchell v. Washingtonville Cent. Sch.*

---

[26]  "Once the plaintiff has met [her] burden of proving that
reasonable accommodations exist, the employer may present
evidence that the plaintiff's requested accommodation imposes an
undue burden on the employer."  *Lamb*, 33 Fed. Appx. at 59
(*citing* 42 U.S.C.A. § 12112(b)(5)(A)).

*Dist.*, 190 F.3d 1, 6 (2d Cir. 1999)).  Before it can be determined whether a plaintiff could have performed the essential functions of a position with reasonable accommodation, those functions must be established.  Here, the essential functions of a restaurant manager are in dispute.  Accordingly, summary judgment is precluded.

> 3.   Prior Representations About Hart's Ability to Work

Denny's contends that Hart has made prior representations about her inability to work--in her malpractice action[27] and successful applications for long-term disability and Social Security Disability Insurance ("SSDI") benefits--which are "wholly inconsistent" with her current position that she could have performed the essential functions of a restaurant manager in May 2003.  Def.'s Mot. 37-40.  The EEOC disagrees.  Pl.'s Opp. 35-43.

> a.   Evidence in Hart's Medical Malpractice Action

Denny's argues that Hart admitted that she was unable to work in interrogatory responses in her medical malpractice case. In those responses, Hart stated that she had "lost wages from May 2003," Hart Dep. Ex. 30 at 3, and "been unable to work since

---

[27]   Denny's does not appear to argue that factual findings from Hart's medical malpractice action have a preclusive effect but instead contends that no reasonable jury could find that Hart was able to work in 2003 given statements made and endorsed by her in that action.  *See* Def.'s Mot. 17-22.

2003," *id*. at Ex. 31 at 12.  These brief statements, in answer
to questions about her anticipated damages, do not indicate
whether Hart was unable to work because of her physical
incapacity or because Denny's had fired her.  Drawing inferences
in favor of the EEOC, the Court assumes the latter.

Denny's also argues that several experts retained by Hart
for her medical malpractice action stated that she was unable to
work after the operations.  Def.'s Mot. 17-22; Def.'s Reply 16-
19.  Considering those statements in the light most favorable to
the EEOC, a jury could reasonably determine that Hart could work
in May 2003.

In his October 2006 report, Economist Louis J. Maccini
wrote that Hart had a "post-injury income capacity . . . [of]
essentially zero."  Def.'s Ex. 25 at 5.  But, read in context,
this estimate of Hart's earning capacity appears to be based on
Maccini's finding that "[e]xcept for six days in April 2003,
[Hart] *has not worked* since December 11, 2002" and not on an
actual assessment of her physical ability to work.  *Id*.
(emphasis added).  Maccini also reported that Hart was "now able
to do 5% of the cooking and the meal cleanup, 25% of the house
cleaning, 25% of the shopping, but none of the yard work."  *Id*.
at 7.  These comments on Hart's ability to do household tasks
were made with reference to her capacity at the time of his 2006
report.  Because the issue here is whether Hart was able to work

at the time of her termination in May 2003, Hart's physical abilities in 2006 are largely irrelevant.[28]

Of the expert opinions cited by Denny's, only Vocational Rehabilitation Counselor Steven Shedlin appears to address Hart's ability to work as a restaurant manager at Denny's in May 2003. *See* Def.'s Ex. 26. His February 22, 2006 report stated that:

> [w]ithout a prosthesis, [Hart] has the functional ability to work in a sedentary capacity, which would rule out her returning to work in any of her prior jobs which required working at a light-medium duty capacity due to standing, walking and some lifting. However, even though she may have the ability to work in a sedentary duty capacity, she has not been released to return to work due to the severe pain that she experiences and the prescription medications that she takes to help alleviate the pain to some degree . . . As such, [Hart] has sustained a total loss of earning capacity from her work as a restaurant manager at Denny's.

Def.'s Ex. 26 at 2. Although Shedlin's opinion about Hart's ability to work as a restaurant manager in 2003 may be relevant, it does not end the analysis.

To clarify his 2006 report, Shedlin testified that his "opinion was that, absent any change in [Hart's] condition, that she would have zero earning capacity *from that point in 2006*

---

[28] The opinions of Dr. Michael April and Life Care Planner Terri Patterson may be similarly limited to Hart's ability to work in 2006 and 2007. *See* Michael April Dep. 32:4-17, Aug. 14, 2006 (answering the question of whether Hart was "currently able to work"); Michael April Dep. 86-92, 101-106, Jan. 11, 2007 (reflecting on Hart's current impairments and ability to work); Terri Patterson Dep. 53:4-6, Apr. 25, 2006 (assessing that "right now [Hart] can't work given her medical status with all the pains she is having, and limited mobility").

through her work life expectancy."  Steven Shedlin Dep. 26:12-
16, June 24, 2009 (emphasis added).[29]  He further testified that
he did not know "when she had been restricted from returning to
work by her treating physician" but only that "in 2006 that was
the case."  *Id*. at 66:21-2, 5.  Shedlin also confirmed that he
did not "perform a job analysis of the restaurant manager job at
Denny's" or render any opinion as to Hart's ability to
accomplish the essential functions of that position in his 2006
report.  *Id*. at 65:1-21.  This testimony indicates that
Shedlin's 2006 report did not assess Hart's ability, with
reasonable accommodation, to perform the essential functions of
a Denny's restaurant manager in May 2003.

      b.   Applications for Disability Benefits

    It is well-settled that "[t]he mere act of applying for
disability benefits does not estop a plaintiff from making a
subsequent ADA claim."  *Fox v. Gen. Motors Corp.*, 247 F.3d 169,
177 (4th Cir. 2001).[30]  However, to avoid summary judgment in

---

[29]  Shedlin also testified that he was "retained to offer an
opinion in [Hart's] personal injury matter concerning her
ability to work at the time [he] interviewed her . . . in 2006."
Shedlin Dep. 60:5-10.

[30]  Despite the appearance of conflict when a plaintiff files a
claim under the ADA after having applied for--and received--
disability benefits, these "'claims do not inherently conflict
to the point where courts should' presume that 'the claimant or
recipient of . . . benefits is judicially estopped from
asserting that he is a qualified individual with a disability.'"

such situations, "an ADA plaintiff who is shown to have claimed total disability in the context of another statutory scheme 'is required to proffer a sufficient explanation for any apparent contradiction between the two claims.'" *Id.* (*quoting EEOC v. Stowe-Pharr Mills, Inc.*, 216 F.3d 373, 378 (4th Cir. 2000)). That explanation must enable a reasonable juror to find "that, assuming the truth of, or the plaintiff's good faith belief in, the earlier statement, the plaintiff could nonetheless perform the essential functions of her job with or without reasonable accommodation." *Cleveland*, 526 U.S. at 807 (internal quotation marks omitted).

Here, the EEOC offers two reasonable explanations for the apparent contradiction between Hart's ADA claim and the representations in her SSDI application. First, it argues that there is no "temporal overlap" because Hart's SSDI benefits were not approved until almost a year after she was terminated from Denny's. Pl.'s Opp. 39. It is undisputed that Hart's May 2003 application for Social Security benefits was denied, and it was not until after Hart's June 2004 request for reconsideration that she was approved and began receiving benefits. Hart Dep. I

---

*Fox*, 247 F.3d at 177 (*quoting Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 800-02 (1999)).

187:6-17, Ex. 22.[31]  Generally, "if an individual has merely

applied for, but has not been awarded, SSDI benefits, any

inconsistency in the theory of the claims is of the sort

normally tolerated by our legal system." *Cleveland*, 526 U.S. at

805.

Further, the EEOC argues that when Hart applied for SSDI

benefits, she did not thereby mean to imply that she could not

work with reasonable accommodation.  Pl.'s Opp. 40.  Hart

testified that she "believed [she] could work as a restaurant

manager with help to find reasonable accommodations" when she

applied for SSDI benefits and told her Social Security

Administration ("SSA") representative that she had returned to

work before Denny's terminated her.  Hart Decl. ¶ 7.  Because

the SSA does not consider the possibility of reasonable

accommodation when a person applies for SSDI, "an ADA suit

claiming that the plaintiff can perform her job *with* reasonable

accommodation may well prove consistent with an SSDI claim that

the plaintiff could not perform her own job *without* it."

*Cleveland*, 526 U.S. at 803.[32]  Hart's present claim that she

---

[31]  Hart also stated in her application for reconsideration that
her depression had worsened since her initial request.  Hart
Dep. Ex. 23.

[32]  There is also no evidence that Hart's long-term disability
insurer considered her ability to work with reasonable
accommodation before granting her request for benefits.  Hart
has testified that during the "application process no one ever

could have worked at Denny's with reasonable accommodation is reconcilable with her past claims for disability insurance.

III. Conclusion

For the reasons stated above, Denny's motion for summary judgment will be denied, and its motion to seal will be granted.


July 16, 2010
_____/s/_____
Date                                William D. Quarles, Jr.
                                    United States District Judge

communicated to [her] anything about whether being disabled for benefits purposes meant with or without reasonable accommodation." Hart Decl. ¶ 4.